**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

No. 15-5051

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

––––––––––––––––––––

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR UNITED
STATES ATTORNEYS and UNITED STATES DEPARTMENT OF JUSTICE,

Defendants-Appellees.

––––––––––––––––––––

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

––––––––––––––––––––

**BRIEF FOR APPELLEES**

––––––––––––––––––––

BENJAMIN C. MIZER
  *Principal Deputy Assistant*
  *Attorney General*

VINCENT H. COHEN, JR.
  *Acting United States Attorney*

LEONARD SCHAITMAN
LEWIS S. YELIN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7239*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*
  *(202) 514-3425*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    <u>Parties and Amici</u>.

The National Association of Criminal Defense Lawyers was the plaintiff in the district court and is the appellant in this Court.  The United States Department of Justice Executive, Office for United States Attorneys and the United States Department of Justice were the defendants in the district court and are the appellees in this Court.  Amicus Curiae in this Court in support of the appellant are the American Civil Liberties Union, the American Civil Liberties Union of the Nation's Capital, and the Electronic Frontier Foundation; the Constitution Project and the Innocence Project; and Sixty-Three Law Professors.

### B.    <u>Rulings Under Review</u>.

The ruling under review is a final order of the district court, *National Ass'n of Criminal Defense Lawyers v. Executive Office for United States*

*Attorneys*, which is reported at 75 F. Supp. 3d 552 (D.D.C. 2014), and

reproduced in the Joint Appendix at 109-122.

### C.    <u>**Related Cases**</u>.

I am aware of no related case pending in this or any other court.

<u>s/ Lewis S. Yelin</u>     <br>
LEWIS S. YELIN<br>
  *Counsel for Appellees*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

TABLE OF AUTHORITIES.................................................................iii

GLOSSARY ....................................................................................viii

STATEMENT OF JURISDICTION ....................................................1

STATEMENT OF THE ISSUES ..........................................................2

PERTINENT STATUTES ...................................................................3

STATEMENT OF THE CASE..............................................................3

STATEMENT OF FACTS....................................................................5

   I.     Statutory Background .................................................5

     A.   FOIA Exemption 5.................................................5

     B.   FOIA Exemption 7(E)............................................9

   II.    Factual Background.................................................12

   III.   Prior Proceedings...................................................17

SUMMARY OF ARGUMENT ...........................................................21

STANDARD OF REVIEW ................................................................29

ARGUMENT.....................................................................................30

   I.     The Blue Book Is Exempt From Disclosure Under
        Exemption 5............................................................30

     A.   The Blue Book Is Attorney Work Product Prepared
         Because of the Prospect of Litigation. .................30

B.     NACDL's Contrary Arguments Lack Merit......................................35

II.    The Blue Book Is Exempt From Disclosure Under Exemption 7(E).........................................................................50

A.     The Blue Book Was Compiled for Law Enforcement Purposes and Its Production Would Disclose Techniques, Procedures, or Guidelines That Reasonably Could Be Expected to Risk Circumvention of the Law. ..................................50

B.     NACDL's Contrary Arguments Lack Merit......................................56

CONCLUSION ........................................................................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES[*]

## Cases

*Allard K. Lowenstein Int'l Human Rights Project v. Department of Homeland Sec.,*
626 F.3d 678 (2d Cir. 2010)........................................................... 12, 52

*Blackwell v. Federal Bureau of Investigation,*
646 F.3d 37 (D.C. Cir. 2011) .................................................................12

*Burka v. Department of Health and Human Servs.,*
87 F.3d 508 (D.C. Cir. 1996) .................................................................41

*Coastal States Gas Corp. v. Department of Energy,*
617 F.2d 854 (D.C. Cir. 1980) ......................................................... 35, 43

*\*Delaney, Migdail & Young, Chartered v. Internal Revenue Serv.,*
826 F.2d 124 (D.C. Cir. 1987) ............................... 8, 23, 32, 33, 36, 37, 38, 44

*Federal Bureau of Investigation v. Abramson,*
456 U.S. 615 (1982) ....................................................................... 40, 41

*Federal Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill,*
443 U.S. 340 (1979) ....................................................................... 24, 47

*Federal Trade Comm'n v. Grolier, Inc.,*
462 U.S. 19 (1983) ...............................................................................6

*Hamdan v. Department of Justice,*
__ F.3d__, No. 13-55172, 2015 WL 4773499
(9th Cir. Aug. 14, 2015) ................................................................ 12, 52

---

[*] Authorities on which we chiefly rely are marked with an asterisk.

*Hayden v. National Sec. Agency*,
608 F.2d 1381 (D.C. Cir. 1979) ...........................................................40

*Hickman v. Taylor*,
329 U.S. 495 (1947) ................................................... 8, 39, 41

*In re Sealed Case*,
146 F.3d 881 (D.C. Cir. 1998) ................................ 6, 7, 19, 22, 30, 31,
32, 33, 35, 36, 37

*Jefferson v. Department of Justice, Office of Prof'l Responsibility*,
284 F.3d 172 (D.C. Cir. 2002) ....................................... 10, 56

*Jordan v. Department of Justice*,
591 F.2d 753 (D.C. Cir. 1978) ...................................... 20, 42

*Judicial Watch, Inc. v. Department of Justice*,
432 F.3d 366 (D.C. Cir. 2005) ........................................... 8, 31, 42, 48

*Martin v. Department of Justice*,
488 F.3d 446 (D.C. Cir. 2007) ...........................................................7, 31

*Martin v. Office of Special Counsel, Merit Sys. Prot. Bd.*,
819 F.2d 1181 (D.C. Cir. 1987) ...........................................................48

*Mayer Brown LLP v. Internal Revenue Serv.*,
562 F.3d 1190 (D.C. Cir. 2009) ........................................ 28, 53, 54, 60

*Milner v. Department of Navy*,
562 U.S. 562 (2011) ................................................. 8, 22, 32

*Morley v. CIA*,
508 F.3d 1108 (D.C. Cir. 2007) ...........................................................60

*Murphy v. Executive Office for U.S. Attorneys*,
789 F.3d 204 (D.C. Cir. 2015) ..................................................... 29, 30

- iv -

*National Labor Relations Bd. v. Sears, Roebuck & Co.,
    421 U.S. 132 (1975) ................................................. 5, 21, 40, 41, 46, 47

*Public Emps. for Envtl. Responsibility v. United States Section,
    Int'l Boundary & Water Comm'n, U.S.–Mexico,
    740 F.3d 195 (D.C. Cir. 2014) ............................ 10, 11, 12, 25, 51, 52,
                                                                                        53, 56

*Schiller v. National Labor Relations Bd.,
    964 F.2d 1205 (D.C. Cir. 1992) ............................ 7, 19, 22, 23, 32, 36,
                                                                                        37, 40, 42

*Tax Analysts v. Internal Revenue Serv.,
    294 F.3d 71 (D.C. Cir. 2002) ................................ 10, 25, 27, 47, 52, 56

United States v. Deloitte LLP,
    610 F.3d 129 (D.C. Cir. 2010) ................................................. 48, 49, 50

United States v. Nobles,
    422 U.S. 225 (1975) ............................................................. 6, 7, 39, 50

United States v. Ruiz,
    536 U.S. 622 (2002) .............................................................................55

United States v. Stevens,
    No. 08-cr-231 (EGS), 2009 WL 6525926
    (D.D.C. Apr. 7, 2009) ........................................................................14

## Statutes

Pub. L. No. 99-570, § 1802(a), 100 Stat. 3207, 3207-48 to
    3207-49 (1986) ...................................................................................59

5 U.S.C. § 552 ................................................................................................4

    § 552(a) .........................................................................................5

5 U.S.C. § 552, cont.

§ 552(a)(2) ................................................................ 20, 47

§ 552(b) .......................................................... 5, 9, 21, 48

§ 552(b)(5) .................................................................4, 5

§ 552(b)(7)(E) ....................................... 4, 5, 9, 11, 27, 51, 52, 58

5 U.S.C. § 552(b)(7)(E) (1982) ..........................................58

28 U.S.C. § 1291 ........................................................2

28 U.S.C. § 1331 ........................................................1

29 U.S.C. § 160(b) .....................................................40

## Rules

Fed. R. App. P. 4(a)(1)(B)(ii) .........................................2

Fed. R. Civ. P. 26(b)(3) ...............................................6

## Other Authorities

David W. Ogden, Deputy Attorney General, U.S. Dep't of Justice:

"Issuance of Guidance and Summary of Actions Taken in
Response to the June 2009 Report of the DOJ Criminal
Discovery and Case Management Working Group"
(Jan. 4, 2010) ...........................................................14

"Requirement for Office Discovery Policies in Criminal
Matters" (Jan. 4, 2010) ................................................14

"Guidance for Prosecutors Regarding Criminal Discovery"
(Jan. 4, 2010) ...........................................................14

- vi -

Restatement (Third) of the Law Governing Lawyers (Am. Law
    Inst. 2000) ...........................................................................36

S. Rep. No. 89-813 (1965)...........................................................41

U.S. Dep't of Justice:

    Attorney General's Memorandum on the 1986 Amendments
    to the Freedom of Information Act (1987) .....................................59

    *FY 2015 Budget Request At A Glance (U.S. Attorneys)* (n.d.) ..........42

    *Public USAO Criminal Discovery Policies* (n.d.) ...............................15

    *United States Attorneys' Annual Statistical Report: Fiscal Year
    2014* (n.d.)...........................................................................42

    United States Attorneys' Manual .....................................................12

        § 1-1.100 ...........................................................................12

        § 9-5.001 ...................................................................... 12, 13

        § 9-5.100 ...................................................................... 12, 13

## GLOSSARY

| | |
|---|---|
| EAJA | Equal Access to Justice Act |
| EOUSA | Executive Office for United States Attorneys |
| FOIA | Freedom of Information Act |
| JA | Joint Appendix |
| NACDL | National Association of Criminal Defense Lawyers |
| USAM | United States Attorneys' Manual |

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 15-5051

_____

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE
FOR UNITED STATES ATTORNEYS and UNITED STATES
DEPARTMENT OF JUSTICE,

Defendants-Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

**BRIEF FOR APPELLEES**

_____

**STATEMENT OF JURISDICTION**

The district court had jurisdiction over the National Association of

Criminal Defense Lawyers' complaint under 28 U.S.C. § 1331.  The district

court granted the government's motion for summary judgment and

entered final judgment on December 18, 2014.  JA 108.  The National

Association of Criminal Defense Lawyers filed a notice of appeal on

February 12, 2015, within the 60-day period prescribed by Federal Rule of

Appellate Procedure 4(a)(1)(B)(ii).  JA 123.  This Court has jurisdiction

under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court correctly held that the document

"Federal Criminal Discovery" is exempt from disclosure as attorney work

product under Exemption 5 of the Freedom of Information Act because the

document is a litigation manual, created by Department of Justice attorneys

for the use of federal prosecutors, that provides litigation advice

concerning discovery-related issues that arise in criminal investigations

and prosecutions; and

2.  Whether the document "Federal Criminal Discovery" also is

exempt from disclosure under Exemption 7(E) of the Freedom of

Information Act because it was compiled for law enforcement purposes

and its production would disclose techniques and procedures for law

enforcement investigations or prosecutions, or would disclose guidelines

for law enforcement investigations or prosecutions that reasonably could

be expected to risk circumvention of the law.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

In this litigation, Appellant National Association of Criminal Defense

Lawyers (NACDL) seeks to compel the Executive Office for United States

Attorneys (EOUSA) and the United States Department of Justice to disclose

a document entitled "Federal Criminal Discovery" and referred to as the

"Blue Book."  JA 7.  The Blue Book is a litigation manual created by

Department of Justice attorneys for the use of federal prosecutors in

conducting criminal prosecutions.  JA 82 (Gerson Decl. ¶ 10).[1]  The Blue

---

[1] Susan B. Gerson has been the Assistant Director in the Freedom of Information Act/Privacy Act Staff of the Executive Office for United States Attorneys since 2011.  JA 79 (Gerson Decl. ¶ 1).  That office processes requests for information from EOUSA under the Freedom of Information Act.  *Id.* (Gerson Decl. ¶ 2).

Book contains "comprehensive legal analysis and advice on criminal discovery practices, potential strategic and logistical concerns, interpretations of law and risk assessments in light of relevant legal authority, as well as precedent, practice notes, techniques, procedures, and legal strategies that in-the-field prosecutors may and do employ during the course of criminal proceedings."  JA 94 (First Goldsmith Decl. ¶ 6).[2]

Invoking the Freedom of Information Act (FOIA), 5 U.S.C. § 552, NACDL submitted a request for the Blue Book to EOUSA.  JA 27-30.  That agency denied NACDL's request, invoking FOIA Exemptions 5 and 7(E).  JA 32-33; *see* 5 U.S.C. § 552(b)(5), (7)(E).  NACDL appealed that decision administratively to the Department of Justice's Office of Information Policy.  JA 35-37.  That office affirmed EOUSA's decision under Exemption 5.  JA 41-42.  NACDL then brought suit, alleging that EOUSA and the Department of Justice had improperly withheld the Blue Book.  JA 7-25.

---

[2] Andrew D. Goldsmith has been the National Criminal Discovery Coordinator for the Department of Justice since January 2010.  JA 92 (First Goldsmith Decl. ¶ 1).  In that role, he oversees "national initiatives designed to provide federal prosecutors and other law enforcement officials with training and resources related to criminal discovery."  *Id.*

After reviewing the Blue Book *in camera*, JA 113, the district court granted

the government's motion for summary judgment, concluding that the Blue

Book is attorney work product protected from disclosure by FOIA

Exemption 5, JA 109-22.  NACDL now appeals from that decision.  JA 123.

## STATEMENT OF FACTS

### I.    STATUTORY BACKGROUND

"FOIA requires the government to disclose, upon request, broad

classes of documents identified in 5 U.S.C. § 552(a).  It exempts from

disclosure nine categories of documents described in 5 U.S.C. § 552(b)."

*Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 (D.C. Cir. 2015).  At issue

in this case are Exemptions 5 and 7(E).  *See* 5 U.S.C. § 552(b)(5), (7)(E).

### A.    FOIA Exemption 5

FOIA Exemption 5 protects from disclosure "inter-agency or intra-

agency memorandums or letters which would not be available by law to a

party  .  .  .  in litigation with the agency." 5 U.S.C. § 552(b)(5).  Records are

exempt from disclosure under Exemption 5 if they would be "normally

privileged in the civil discovery context."  *National Labor Relations Bd. v.*

*Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Accordingly, Exemption 5

encompasses the attorney work-product doctrine. *Federal Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 20 (1983); *see Sears*, 421 U.S. at 154 ("It is . . . clear that Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5.").

"The work-product privilege protects written materials lawyers prepare 'in anticipation of litigation.'" *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (quoting Fed. R. Civ. P. 26(b)(3)). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). "By ensuring that lawyers can prepare for litigation without fear that opponents may obtain their private notes, memoranda, correspondence, and other written materials, the privilege protects the adversary process." *Sealed Case*, 146 F.3d at 884. That interest underlying the attorney work-product doctrine is present in both the civil and criminal context. Indeed, "[a]lthough the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is

6

even more vital.  The interests of society and the accused in obtaining a fair

and accurate resolution of the question of guilt or innocence demand that

adequate safeguards assure the thorough preparation and presentation of

each side of the case." *Nobles*, 422 U.S. at 238.

A document prepared by an attorney analyzing a specific claim for

relief associated with a particular investigation or suit qualifies as attorney

work product.  *See Sealed Case*, 146 F.3d at 885; *Martin v. Department of

Justice*, 488 F.3d 446, 455 (D.C. Cir. 2007).  But this Court has "rejected the

need for a specific claim."  *Sealed Case*, 146 F.3d at 885.  Instead, "[t]he

testing question for the work-product privilege," this Court has held, "is

whether, in light of the nature of the document and the factual situation in

the particular case, the document can fairly be said to have been prepared

or obtained because of the prospect of litigation."  *Id.* at 884 (quotation

marks omitted); *see Schiller v. National Labor Relations Bd.*, 964 F.2d 1205,

1208 (D.C. Cir. 1992) (rejecting specific claim requirement and upholding

under Exemption 5 withholding of documents that provide advice to

agency counsel on how to build a defense and litigate claims under the

Equal Access to Justice Act (EAJA) and that provide instructions on preparing and filing relevant pleadings), *abrogated in part on other grounds by Milner v. Department of Navy*, 562 U.S. 562 (2011); *Delaney, Migdail & Young, Chartered v. Internal Revenue Serv.*, 826 F.2d 124, 127 (D.C. Cir. 1987) (rejecting specific claim requirement and upholding under Exemption 5 withholding of "IRS memos advis[ing] the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome").

In light of the importance of the work-product doctrine to the adversary process, this Court has held that, even in the FOIA context, "the doctrine should be interpreted broadly and held largely inviolate." *Judicial Watch, Inc. v. Department of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005) (discussing *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)); *see Sealed Case*, 146 F.3d at 886. Moreover, because "[a]ny part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under exemption 5," *Judicial Watch*, 432 F.3d at 371 (quotation marks

8

omitted; alterations in original), there is no segregability requirement, and

no part of a document exempt from disclosure under Exemption 5 is

subject to release under FOIA.  *See id.* ("[F]actual material is itself

privileged when it appears within documents that are attorney work

product."); *cf.* 5 U.S.C. § 552(b) (generally requiring the release of "[a]ny

reasonably segregable portion of a record  .  .  .  after deletion of the

portions which are exempt under this subsection").

### B.     FOIA Exemption 7(E)

FOIA Exemption 7(E) protects from disclosure "records or

information compiled for law enforcement purposes, but only to the extent

that the production of such law enforcement records or information  .  .  .

would disclose techniques and procedures for law enforcement

investigations or prosecutions, or would disclose guidelines for law

enforcement investigations or prosecutions if such disclosure could

reasonably be expected to risk circumvention of the law."  5 U.S.C.

§ 552(b)(7)(E).

The threshold requirement for a record to fall within Exemption 7 is

that it be "compiled for law enforcement purposes."  *Public Emps. for Envtl.*

*Responsibility v. United States Section, Int'l Boundary & Water Comm'n, U.S.–*

*Mexico*, 740 F.3d 195, 202-03 (D.C. Cir. 2014) (*PEER*).  A record is compiled

for law enforcement purposes if it rationally relates to an investigation of

"specific alleged illegal acts which could result in civil or criminal

sanctions."  *Jefferson v. Department of Justice, Office of Prof'l Responsibility*, 284

F.3d 172, 177 (D.C. Cir. 2002).  But the statutory threshold is "not limited to

records or information addressing only individual violations of the law."

*Tax Analysts v. Internal Revenue Serv.*, 294 F.3d 71, 79 (D.C. Cir. 2002).

"[I]nternal agency material relating to guidelines, techniques, and

procedures for law enforcement investigations and prosecutions," this

Court has held, "clearly satisfy the 'law enforcement purposes' threshold of

Exemption 7," even if the material is compiled "outside of the context of a

specific investigation."  *Id.* at 78.  Moreover, "[i]f the agency's principal

function is law enforcement, [this Court is] more deferential to the agency's

10

claimed purpose for the particular records."  *PEER*, 740 F.3d at 203

(quotation marks omitted).

Once the threshold requirement is met, Exemption 7(E) requires the

agency to show that production of the requested document "would

disclose techniques and procedures for law enforcement investigations or

prosecutions, or would disclose guidelines for law enforcement

investigations or prosecutions if such disclosure could reasonably be

expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

"Exemption 7(E)'s requirement that disclosure risk circumvention of the

law sets a relatively low bar for the agency to justify withholding.  To clear

that relatively low bar, an agency must demonstrate only that release of a

document might increase the risk that a law will be violated or that past

violators will escape legal consequences."  *PEER*, 740 F.3d at 204-05

(quotation marks and citations omitted).[3]

---

[3] This Court has not decided whether the risk-of-circumvention
requirement applies only to "guidelines" or also to "techniques and
procedures."  *See PEER*, 740 F.3d at 204 n.4.  Without squarely addressing
the issue, this Court has applied the requirement to each category.  *See id*.;

11

II.    **FACTUAL BACKGROUND**

The United States Attorneys' Manual (USAM) is a reference guide for Department of Justice attorneys that "contains general policies and some procedures relevant to the work of the United States Attorneys' offices and to their relations with the legal divisions, investigative agencies, and other components within the Department of Justice."  USAM § 1-1.100.  The USAM, which is publicly available, *see* http://www.justice.gov/usao/eousa/ foia_reading_room/usam/ (last visited Aug. 27, 2015), describes the Department's policies concerning disclosure by federal prosecutors in criminal proceedings.  *See* USAM §§ 9-5.001, 9-5.100.

---

*Blackwell v. Federal Bureau of Investigation*, 646 F.3d 37, 41-42 (D.C. Cir. 2011).  The two courts of appeals to have considered the issue have held that "the statutory text and structure" unambiguously require a risk of circumvention only for guidelines.  *Hamdan v. Department of Justice*, __ F.3d__, No. 13-55172, 2015 WL 4773499, at *13 (9th Cir. Aug. 14, 2015); *see Allard K. Lowenstein Int'l Human Rights Project v. Department of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010).  The government agrees with that interpretation.  But "given the low bar posed by the 'risk circumvention of the law' requirement, it is not clear that the difference matters much in practice."  *PEER*, 740 F.3d at 204 n.4.

In 2006, the Department of Justice amended the USAM "to mandate broader disclosure of exculpatory and impeachment evidence than the Constitution requires."  JA 66 (Statement of Deputy Attorney General James M. Cole Before the Senate Comm. on the Judiciary (June 6, 2012) (Cole Statement)); *see* JA 101-02 (Second Goldsmith Decl. ¶ 5).  For example, "[t]he USAM requires prosecutors to disclose information beyond that which is 'material' to guilt as articulated by the U.S. Supreme Court, and prosecutors must disclose exculpatory or impeachment information 'regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.'"  JA66 (Cole Statement) (quoting USAM § 9-5.001); *see also* USAM § 9-5.100 (stating departmental policy regarding disclosure of potential impeachment information concerning law enforcement agency witnesses).

Despite the Department's clear statement of prosecutors' disclosure obligations, in 2008, federal prosecutors improperly withheld significant exculpatory and impeachment evidence from the defense in the trial of

then-United States Senator Ted Stevens.  *See* JA 65 (Cole Statement).  In light of that misconduct, at the direction of the Attorney General, the United States moved to set aside the jury's guilty verdict and dismissed the indictment; the district court granted that relief.  *See United States v. Stevens*, No. 08-231, 2009 WL 6525926 (D.D.C. Apr. 7, 2009).

In response to the *Stevens* case, the Department of Justice "significantly increased [its] focus on providing prosecutors and agents with the improved guidance, training, and resources necessary to comply with [the Department's discovery] policy and meet their discovery obligations."  JA 66 (Cole Statement); *see* JA 67-68 (Cole Statement) (detailing steps taken).  Central to that effort, in early 2010, the Deputy Attorney General "issued three memoranda to all criminal prosecutors: 'Issuance of Guidance and Summary of Actions Taken in Response to the June 2009 Report of the DOJ Criminal Discovery and Case Management Working Group,' 'Requirement for Office Discovery Policies in Criminal Matters,' and 'Guidance for Prosecutors Regarding Criminal Discovery.'"  JA 66 (Cole Statement); *see* JA 95 (First Goldsmith Decl. ¶ 8), 102-03 (Second

Goldsmith Decl. ¶ 6). Those memoranda, which are publicly available, *see*

http://www.justice.gov/dag/selected-publications (last visited Aug. 27,

2015), "provide overarching guidance [to federal prosecutors] on gathering

and reviewing potentially discoverable information and making timely

disclosure to defendants." JA 102 (Second Goldsmith Decl. ¶ 6); *see also* JA

67-68 (Cole Statement) (identifying other steps taken to improve the

Department of Justice's disclosure policies and practices).[4]

The Department of Justice also created the Blue Book as part of its

response to the failings in the *Stevens* case. JA 67 (Cole Statement). "The

Blue Book was designed to provide advice regarding the law and practice

of federal prosecutors' discovery disclosure obligations and to serve as a

litigation manual to be used by all DOJ prosecutors and paralegals." JA 93

(First Goldsmith Decl. ¶ 5). Like the USAM and the Deputy Attorney

---

[4] Each United States Attorney's Office subsequently adopted a criminal discovery policy to ensure uniform discovery practices within districts. Those policies also are publicly available. *See* U.S. Dep't of Justice, *Public USAO Criminal Discovery Policies* (n.d.), http://www.justice.gov/usao/resources/foia-library/public-usao-criminal-discovery-policies (last visited Aug. 27, 2015).

General memoranda, the Blue Book "endeavors to accurately describe the

prosecutor's discovery obligations."  JA 86 (Gerson Decl. ¶ 21).  But unlike

those other materials, the Blue Book does not simply state departmental

policy concerning disclosure.  Rather, it "is a litigation manual for

prosecutors containing confidential legal analysis and strategies to support

the Government's investigations and prosecutions."  *Id*.

> For example,

> the Blue Book discusses the circumstances under which broad and
> early disclosure is advised and when it is not advised.  It also
> explicitly discourages certain practices and encourages others, and
> identifies factors prosecutors should consider before making
> particular discovery and litigation decisions, such as seeking
> protective orders.  In addition, it describes the types of claims defense
> counsel have raised and could raise regarding different discovery
> issues, or the tactics they could employ in litigation against the
> Government, and the arguments prosecutors can make to respond to
> these claims and the steps they should take to counter defense
> counsel tactics and protect Government investigations and
> prosecutions.  In doing so, the Blue Book explains the limitations of
> certain arguments that prosecutors could make.  The Blue Book also
> offers compilations of cases that prosecutors could use to support
> different arguments.  Cases illustrating potential pitfalls that
> prosecutors should avoid are also described, and arguments
> prosecutors could make if they fall into these pitfalls are identified.

JA 85-86 (Gerson Decl. ¶ 21).  Thus, "[t]he Blue Book contains

comprehensive legal analysis and advice [to federal prosecutors] on

criminal discovery practices, potential strategic and logistical concerns,

interpretations of law and risk assessments in light of relevant legal

authority, as well as precedent, practice notes, techniques, procedures, and

legal strategies that in-the-field prosecutors may and do employ during the

course of criminal proceedings."  JA 94 (First Goldsmith Decl. ¶ 6).

## III.    PRIOR PROCEEDINGS

After the Department of Justice denied its request for the Blue Book,

NACDL brought suit, alleging that the Department improperly had

withheld the document under FOIA Exemptions 5 and 7(E).  JA 18-23.

Upon consideration of the parties' cross-motions for summary judgment,

the district court held "that the Blue Book is attorney work-product

protected from disclosure pursuant to FOIA Exemption 5."  JA 109-10.

"As an initial matter," the district court noted that "the parties

dispute the nature of the contents of the Blue Book."  JA 112.  While the

Department of Justice described the book as containing "legal advice,

strategies, and arguments for defeating discovery claims," NACDL claimed

that the book is only a document "which comprehensively covers the law,

policy, and practice of prosecutors' disclosure obligations."  *Id*. (quotation

marks omitted).  Because the contents of the document affect the

applicability of FOIA exemptions on which the government relied, the

district court conducted an *in camera* review of the Blue Book.[5]  JA 113.

Based on that review, the district court concluded that the Blue Book is

exempt from disclosure under Exemption 5 as attorney work product.  *Id*.;

*see id*. (declining to consider alternative basis for withholding under

Exemption 7(E)).

　　As the district court explained, the attorney work-product privilege

protects from disclosure documents prepared in anticipation of litigation.

JA 113.  "The operative test is a functional test," the district court noted:

"whether, in light of the nature of the document and the factual situation in

the particular case, the document can fairly be said to have been prepared

---

[5] The government will upon request provide this Court with a copy
of the Blue Book, which is part of the formal district court record, for this
Court's own *in camera* review.

18

or obtained because of the prospect of litigation."  JA 114 (quoting *Sealed*

*Case*, 146 F.3d at 885 (quotation marks omitted)).

Based on its *in camera* review, the district court determined that the

Blue Book is a document "prepared in anticipation of foreseeable litigation

against the agency."  JA 116.  Adopting the description of the Blue Book

contained in the government's *Vaughn* index, the district court explained

that the Blue Book

> encourages certain practices and discourages others; identifies factors
> prosecutors should consider in making particular decisions; describes
> the types of claims/tactics defense counsel raise/employ and provides
> advice and authority to counter those claims/tactics; evaluates the
> merits of arguments prosecutors can make; and illustrates with cases
> pitfalls for prosecutors to avoid, including arguments available in
> case prosecutors fall into those pitfalls.

*Id*. (quoting JA 52-53).  Accordingly, the district court concluded that the

Blue Book is analogous to the agency documents containing, among other

things, "advice on how to build" a defense against claims under the Equal

Access to Justice Act "and how to litigate" cases involving such claims,

which this Court held were exempt from disclosure as attorney work

product.  *Id*. (quoting *Schiller*, 964 F.2d at 1208).

NACDL relied on decisions from this Circuit that, it argued, limited the attorney work-product doctrine to documents prepared in anticipation of a specific trial.  JA 117.  But the district court determined that NACDL had misdescribed those decisions, which concluded that documents were not attorney work product "not simply because they weren't prepared for a particular case, but because 'they were not even prepared in anticipation *of trials in general*.'"  JA 118 (quoting *Jordan v. Department of Justice*, 591 F.2d 753, 777 (D.C. Cir. 1978)).

For a similar reason, the district court declined to follow a recent order from the District Court for the District of Oregon ordering the Department of Justice to disclose the Blue Book (under a protective order) to a criminal defendant.  JA 119-20.  That district court had improperly narrowed the scope of the attorney work-product privilege by failing to consider whether the Blue Book had been prepared to protect against possible future litigation.  JA 120.

Finally, the district court rejected NACDL's contention that the Blue Book must be disclosed under 5 U.S.C. § 552(a)(2) because it constitutes

"working law."  JA 120; *see Sears*, 421 U.S. at 153 (describing "working law"

as an agency's reasons for adopting a law or policy).  The district court

rejected NACDL's characterization of the Blue Book as containing working

law.  JA 121.  And it held that, even assuming that the Blue Book contains

working law, FOIA's affirmative-disclosure obligation "does not apply" to

the Blue Book because it is attorney work product that is exempt from

disclosure.  *Id.* (quoting 5 U.S.C. § 552(b)); *see* JA 122 ("In addition, there is

no obligation on the [Department] to segregate and release any working

law the Blue Book contains.").

Because the "Blue Book is fully protected" from disclosure under

Exemption 5 as attorney work product, the district court granted the

government's motion for summary judgment.  JA 122.

## SUMMARY OF ARGUMENT

1.  The district court correctly concluded that the Blue Book is exempt

from disclosure under FOIA Exemption 5 because it is attorney work

product "prepared in anticipation of foreseeable litigation."  JA 116.

"[I]n light of the nature of the document and the factual situation" in which it was prepared, the Blue Book "can fairly be said to have been prepared . . . because of the prospect of litigation." *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (quotation marks omitted).  The declarations filed in this case make clear that the Blue Book is a litigation manual prepared by Department of Justice attorneys for federal prosecutors for use in current and future criminal prosecutions.  JA 93-94 (First Goldsmith Decl. ¶ 5).  Among other things, the Blue Book provides "comprehensive legal analysis and advice on criminal discovery practices," including "potential strategic and logistical concerns," "risk assessments in light of relevant legal authority," "practice notes," and "legal strategies that in-the-field prosecutors may and do employ during the course of criminal proceedings."  JA 94 (First Goldsmith Decl. ¶ 6).  As such, the Blue Book is indistinguishable from the documents this Court held were exempt under the attorney work-product doctrine in *Schiller v. National Labor Relations Bd.*, 964 F.2d 1205 (D.C. Cir. 1992), *abrogated in part on other grounds by Milner v.*

*Department of Navy*, 562 U.S. 562 (2011), and *Delaney, Migdail & Young,*

*Chartered v. Internal Revenue Serv.*, 826 F.2d 124 (D.C. Cir. 1987).

NACDL's principal argument is that the work-product doctrine

applies only to documents addressing "a *specific* claim supported by

*concrete* facts which would likely lead to litigation," Br. 15 (quotation marks

omitted), or at least addressing "a particular *transaction*, despite the fact

that no specific *claim* ha[s] yet arisen," Br. 16.  "But [this Court] ha[s]

already rejected that argument."  *Schiller*, 964 F.2d at 1208.  NACDL next

argues that the Blue Book does not constitute attorney work product

because it contains only "objective analysis" and "does not plot litigation

strategy."  Br. 25.  The declarations filed in this case show, however, that

NACDL has seriously misdescribed the Blue Book.

NACDL further argues that the Blue Book cannot qualify as attorney

work product because it contains Department of Justice policies concerning

disclosure.  Br. 31.  But the Blue Book "does not establish new rules or

policies that prosecutors have an obligation to follow in all investigations

and prosecutions."  JA 103 (Second Goldsmith Decl. ¶ 7).  And, in any

event, it is established that even a document containing statements of

policy would be exempt from disclosure if it otherwise is attorney work

product. *Federal Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S.

340, 360 n.23 (1979).

Finally, NACDL argues that even if the Blue Book contains attorney

work product, the Department of Justice must nevertheless segregate that

material and disclose those portions of the document that contain only

statements of policy.  Br. 32-33.  But as NACDL concedes, the segregation

requirement does not apply to documents that are wholly attorney work

product.  Br. 35.  And NACDL identifies no case in which this Court has

required an agency to disclose purportedly unprivileged information

contained in a document prepared entirely by agency attorneys for other

agency attorneys in anticipation of litigation.

2.  This Court could alternatively affirm the district court's judgment

on the ground that the Blue Book is exempt from disclosure under

Exemption 7(E) as a document compiled for law enforcement purposes, the

disclosure of which could reasonably be expected to risk circumvention of the law.

Because the Blue Book is a document "relating to guidelines, techniques, and procedures for law enforcement investigations and prosecutions," it "clearly satisf[ies] the 'law enforcement purposes' threshold of Exemption 7." *Tax Analysts v. Internal Revenue Serv.*, 294 F.3d 71, 78 (D.C. Cir. 2002).  And because its production "might increase the risk that a law will be violated or that past violators will escape legal consequences," the Blue Book "clear[s the] relatively low bar" of the risk-of-circumvention requirement applicable to law enforcement guidelines. *Public Emps. for Envtl. Responsibility v. United States Section, Int'l Boundary & Water Comm'n, U.S.–Mexico*, 740 F.3d 195, 204-05 (D.C. Cir. 2014) (quotation marks omitted).

Disclosing the Blue Book's candid assessments of the government's discovery-related arguments could increase the risk that a law will be violated or that past violators will escape legal consequences, because a criminal defendant who is aware of the government's own assessment of

25

the vulnerabilities of its arguments concerning discovery from the

defendant could potentially alter his or her behavior in a manner calculated

to hide incriminating evidence, thereby making it more likely that he or she

will successfully circumvent the law and escape punishment.  *See, e.g.*, JA

97-98 (First Goldsmith Decl. ¶ 11).

Disclosing the Blue Book also could allow criminal defendants to

interfere with the government's ongoing law enforcement interests, which

the government must balance against its disclosure obligations.  For

example, a criminal defendant with knowledge of the procedures and

techniques the government uses to protect the identity of witnesses and

other sensitive sources could use that information to obtain premature

disclosure of the identity of such individuals, leading to "a greater

likelihood of witness intimidation and retaliation."  JA 98 (First Goldsmith

Decl. ¶ 11).

NACDL erroneously argues that the Blue Book does not satisfy

Exemption 7(E)'s threshold requirement because it does not "focus directly

on specific alleged illegal acts which could result in civil or criminal

26

sanctions." Br. 39 (quotation marks omitted). But the statutory threshold is "not limited to records or information addressing only individual violations of the law." *Tax Analysts*, 294 F.3d at 79. NACDL next argues that the Department of Justice created the Blue Book in furtherance of its managerial, and not prosecutorial, function. Br. 40-41. That contention simply ignores the record evidence that "the Blue Book is a litigation guide intended to offer strategy and advice to prosecutors." JA 99 (First Goldsmith Decl. ¶ 14).

NACDL further argues that disclosure of the Blue Book could not risk circumvention of the law because it "has nothing to do with crime *detection*." Br. 42. But Exemption 7(E) is not limited to investigation or detection methods. It applies to techniques, procedures, and guidelines "for law enforcement investigations *or prosecutions*." 5 U.S.C. § 552(b)(7)(E) (emphasis added). And a defendant aware of the government's candid assessment of the potential weaknesses of its legal arguments concerning discovery would be more likely to successfully hide incriminating evidence

and evade punishment.  *See* JA 96 (First Goldsmith Decl. ¶ 9); JA 85-86

(Gerson Decl. ¶ 21).

NACDL acknowledges that the destruction of incriminating evidence

or witness intimidation would qualify as circumvention of the law.  Br. 44.

But it argues that the government has not explained with "clarity or

specificity" how those harms could follow from disclosure.  *Id*.  The

government's obligation is considerably less, however.  Exemption 7(E)

only requires the government to "demonstrate logically how the release of

the requested information might create a risk of circumvention of the law."

*Mayer Brown LLP v. Internal Revenue Serv.*, 562 F.3d 1190, 1194 (D.C. Cir.

2009) (brackets omitted).  There is an obvious and logical connection

between a potential criminal defendant's knowledge of the government's

own assessment of the strengths and weaknesses of its discovery

arguments, and the possibility that a defendant could use that information

to prevent discovery of incriminating evidence or to identify witnesses or

other sources, conceivably leading to the destruction of evidence or the

intimidation of witnesses.  *See, e.g.*, JA 98 (First Goldsmith Decl. ¶ 11).

Finally, NACDL argues that if the Court concludes that the Blue Book is exempt from disclosure under Exemption 7(E), it should order the Department of Justice to segregate and disclose statements of policy contained in the document. But the Department already has made public other documents that articulate the policies governing federal prosecutors' disclosure obligations. And the discussion of those policies in the Blue Book are contained within litigation analysis and guidance and cannot reasonably be segregated. *See* JA 91 (Gerson Decl. ¶ 35).

## STANDARD OF REVIEW

This Court reviews "*de novo* the district court's grant of summary judgment" in a FOIA case. *Murphy v. Executive Office for U.S. Attorneys*, 789 F.3d 204, 208 (D.C. Cir. 2015). The Court's "task on appeal is to ascertain whether the agency has sustained its burden of demonstrating that the documents requested are exempt from disclosure under the FOIA." *Id*. at 208-09 (quotation marks omitted). "An agency can meet this burden by submitting affidavits [that] describe the justifications for nondisclosure with reasonably specific detail and demonstrate that the information

withheld logically falls within the claimed exemption." *Id*. at 209

(quotation marks omitted).  The Court "ha[s] emphasized that an agency's

task is not herculean.  The justification for invoking a FOIA exemption is

sufficient if it appears logical or plausible." *Id.* (quotation marks omitted).

## ARGUMENT

**I.    THE BLUE BOOK IS EXEMPT FROM DISCLOSURE UNDER EXEMPTION 5.**

**A.    The Blue Book Is Attorney Work Product Prepared Because of the Prospect of Litigation.**

As the district court correctly concluded, the Blue Book is exempt

from disclosure under FOIA Exemption 5 as it is attorney work product

prepared because of the prospect of litigation.  JA 116; *see In re Sealed Case*,

146 F.3d 881, 884 (D.C. Cir. 1998) (holding that whether a document was

prepared in anticipation of litigation is the "testing question" for the work-

product privilege).

This Court has held that any document prepared by a lawyer that

analyzes particular claims for relief in the context of a potential or ongoing

investigation or suit is attorney work product.  In *Martin*, for example,

NACDL made a FOIA request for a "1992 Memorandum from [a Federal

Deposit Insurance Corporation] Investigations Specialist to legal counsel

concerning a bond claim arising out of the fraudulent loan scheme for

which Martin was convicted." *Martin v. Department of Justice*, 488 F.3d 446,

452 (D.C. Cir. 2007). The Court held that the memorandum was prepared

in anticipation of litigation and exempt from disclosure as attorney work

product because it "contains extensive legal analyses of potential claims

available to the [Federal Deposit Insurance Corporation] concerning

fraudulent loans." *Id*. at 455; *see also, e.g., Judicial Watch, Inc. v. Department

of Justice*, 432 F.3d 366, 367-68, 370 (D.C. Cir. 2005) (holding that emails

containing discussion about whether agency should file an amicus brief

and, if so, what position the agency should take, were prepared in

anticipation of litigation and exempt from disclosure as attorney work

product).

But this Court's decisions have "rejected [a] specific claim

*requirement*" for the work-product doctrine. *Sealed Case*, 146 F.3d at 885

(emphasis added). Instead, they instruct that "[t]he testing question . . .

is whether, in light of the nature of the document and the factual situation

in the particular case, the document can fairly be said to have been
prepared or obtained because of the prospect of litigation."  *Id*. at 884
(quotation marks omitted); *see id*. at 885-86 (discussing *Schiller v. National
Labor Relations Bd*., 964 F.2d 1205, 1208 (D.C. Cir. 1992), *abrogated in part on
other grounds by Milner v. Department of Navy*, 562 U.S. 562 (2011), and
*Delaney, Migdail & Young, Chartered v. Internal Revenue Serv*., 826 F.2d 124,
127 (D.C. Cir. 1987)).

Thus, in *Schiller*, this Court held that documents "contain[ing] tips for
handling unfair labor practice cases that could affect subsequent EAJA
litigation"; "contain[ing] advice on how to build an EAJA defense and how
to litigate EAJA cases"; and "provid[ing] instructions on preparing and
filing pleadings in EAJA cases, including arguments and authorities" were
prepared in anticipation of litigation.  *Schiller*, 964 F.2d at 1208; *see id*.
(rejecting specific claim requirement).  And in *Delaney*, the Court held that
documents advising the Internal Revenue Service about "the types of legal
challenges likely to be mounted" against the agency's decision to adopt a
system of statistical sampling to audit large accounts, "potential defenses

available to the agency, and the likely outcome" also were prepared in anticipation of litigation. *Delaney*, 826 F.2d at 127; *see id.* at 126-27 (rejecting specific claim requirement).

Considering "the nature of the document and the factual situation" of its creation, *Sealed Case*, 146 F.3d at 884 (quotation marks omitted), it is clear the Blue Book, like the documents at issue in *Schiller* and *Delaney*, was prepared "because of the prospect of litigation," *id.* (quotation marks omitted). As the declarations in this case make clear—and as the Court will observe if it chooses to conduct an *in camera* review—the Blue Book is a litigation manual for federal prosecutors that provides "comprehensive legal analysis and advice on criminal discovery practices," including "potential strategic and logistical concerns," "risk assessments in light of relevant legal authority," "practice notes," and "legal strategies that in-the-field prosecutors may and do employ during the course of criminal proceedings." JA 94 (First Goldsmith Decl. ¶ 6). The Blue Book attempts to "anticipate[] the challenges that may arise and provides advice for prosecutors to consider in addressing them." JA 104 (Second Goldsmith

Decl. ¶ 8).  It "explicitly discourages certain practices and encourages

others" and "explains the limitations of certain arguments that prosecutors

could make."  JA 85 (Gerson Decl. ¶ 21).  And it is "replete with guidance

where prosecutors are urged to 'exercise caution,' 'take care,' 'be mindful,'

or to 'be aware' when exercising their discretion" concerning discovery

matters.  JA 96 (First Goldsmith Decl. ¶ 9); *see also* JA 52-53 (*Vaughn* Index).

    As the district court concluded:  "[t]he Blue Book  .  .  .  directly

relates to conduct in the adversary trial process since it provides guidelines

and strategies for government prosecutors to consider in disclosing

discovery and litigating against challenges to their discovery practices.  The

Blue Book is entirely focused on a bedrock transaction in the adversarial

trial process—discovery."  JA 118.  The Blue Book is, in short, a document

"created with the intent and effect of helping the agency to prevail within

the adversarial process."  NACDL Br. 11.  Accordingly, attorneys at the

Department of Justice created the Blue Book in anticipation of litigation,

and the document is exempt from disclosure as attorney work product.

### B.     NACDL's Contrary Arguments Lack Merit.

NACDL's contrary arguments are based on mischaracterizations of

the Blue Book or inaccurate statements of the governing law.

1.   NACDL first argues that the attorney work-product doctrine

applies only to documents addressing "'a *specific* claim supported by

*concrete* facts which would likely lead to litigation'" or at least addressing

"a particular *transaction*, despite the fact that no specific *claim* ha[s] yet

arisen."  Br. 15, 16 (quoting *Coastal States Gas Corp. v. Department of Energy*,

617 F.2d 854, 865 (D.C. Cir. 1980) and citing *Sealed Case*, 146 F.3d at 885-86)

(emphasis added by NACDL).[6]  Because the Blue Book was not prepared in

anticipation of a specific claim or particular transaction, NACDL argues

(Br. 23-25), it cannot qualify as attorney work product.

"But [this Court] ha[s] already rejected that argument.  Exemption 5

extends to documents prepared in anticipation of foreseeable litigation,

---

[6] NACDL does not explain what it means by "claim" or
"transaction."  In the context of the attorney work-product doctrine, this
Court has used "claim" to refer to a claim for relief.  *See, e.g., Sealed Case*,
146 F.3d at 885.  And it has used "transaction" to refer to conduct that
could give rise to a claim for relief. *See, e.g., id.* at 888.

even if no specific claim is contemplated." *Schiller*, 964 F.2d at 1208 (citing *Delaney*, 826 F.2d at 127). The attorney work-product doctrine does not necessarily turn on the existence of a "specific claim" or "particular transaction." Rather, "[t]he testing question . . . is whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Sealed Case*, 146 F.3d at 884 (quotation marks omitted); *see* Restatement (Third) of the Law Governing Lawyers § 87 cmt. i (Am. Law Inst. 2000) (stating that the attorney work-product doctrine covers "material produced when apprehension of litigation was reasonable in the circumstances.").

This Court has held that the standard is met when government attorneys provide analysis or strategy concerning litigation in which the government might reasonably become involved. As discussed above, the documents at issue in *Schiller* and *Delaney* did not involve either a specific claim or a particular transaction. *Schiller* involved litigation "tips" and "advice" concerning the handling of unfair labor practice and EAJA cases

36

that the National Labor Relations Board routinely litigated. 964 F.2d at

1208. And *Delaney* concerned advice about the "types of legal challenges,"

826 F.2d at 127, that might be brought challenging the agency's use of

"statistical sampling to audit large accounts," *id.* at 125.

 As with the documents at issue in *Schiller* and *Delaney*, the Blue Book

was prepared by agency attorneys "in anticipation of litigation." *Sealed*

*Case*, 146 F.3d at 885. Like *Schiller*, the Blue Book provides litigation tips

and advice, in this case concerning discovery matters that routinely arise in

federal prosecutions. *See, e.g.*, JA 94, 98-99 (First Goldsmith Decl. ¶¶ 6, 14).

And like *Delaney*, it addresses arguments that other parties might make in

litigation and responses the government might make. *See, e.g.*, JA 85

(Gerson Decl. ¶ 21) (explaining that the Blue Book addresses "the types of

claims defense counsel have raised and could raise regarding different

discovery issues").[7]

---

[7] NACDL suggests that *Delaney* involved a "particular transaction"
because it concerned a document "address[ing] legal issues potentially
arising from a particular government program." Br. 24. But the documents
at issue in *Delaney* did not address the use of statistical sampling in a

Similarly, relying on *Coastal States*, NACDL argues that documents concerning possible future litigation but not addressing specific claims are protected as attorney work product only if the documents address possible suits *against* the government.  Br. 24; *see also* Sixty-Three Law Professors Amicus Br. 12-17 (making same argument); American Civil Liberties Union Amicus Br. 10-14 (making same argument).  Documents concerning legal issues arising in suits *brought* by the government come within the work-product doctrine, NACDL contends, only if the document addresses specific claims arising out of an existing or contemplated suit.  Br. 24.  NACDL's reliance on *Coastal States* is mistaken.  *See Delaney*, 826 F.2d at 127 (explaining that *Coastal State*'s focus on a specific claim "did not intend to lay down [a] blanket rule" and instead "served to isolate those documents

---

particular audit, which could give rise to a claim for relief.  Rather, the documents at issue generally addressed the "types of legal challenges," 826 F.2d at 127, that could be asserted against the government in light of the auditing method the Internal Revenue Service had adopted.  Because *Delaney* did not involve any particular claim for relief or any government conduct that could give rise to such a claim, the documents at issue in that case are no different than the Blue Book, which addresses the types of legal challenges that can arise in the discovery context in criminal prosecutions.

worthy of protection as attorney work product" in the factual context of that case).

Moreover, NACDL's argument that the attorney work-product doctrine has a more limited application in cases brought by the government is inconsistent with the governing precedent. The Supreme Court has never suggested that the attorney work-product doctrine varies depending on whether the contested document was prepared for a potential defendant or plaintiff. To the contrary, the Court has explained that the doctrine reflects the strong "public policy underlying the orderly *prosecution and defense* of legal claims." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947) (emphasis added). Indeed, in explaining that the work-product doctrine applies in criminal as well as civil matters, the Supreme Court stressed that "[t]he interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of *each side of the case*." *United States v. Nobles*, 422 U.S. 225, 238 (1975) (emphasis added). Consistent with that precedent, this Court in *Schiller*

held exempt from disclosure a document containing "tips for handling

unfair labor practice cases" that are brought by the National Labor

Relations Board, as well as related attorney's-fee claims arising in those

cases.  964 F.2d at 1208; *see* 29 U.S.C. § 160(b).

NACDL's arguments seeking to narrow the scope of the work-

product doctrine in the FOIA context appear to stem from its effort to

expand the well-established rule that "[e]xemptions to the FOIA are to be

construed narrowly."  Br. 22 (quoting *Hayden v. National Sec. Agency*, 608

F.2d 1381, 1386 (D.C. Cir. 1979) (alteration in original)); *see id*. at 31.  "[T]his

principle of narrow construction" derives from "the basic policy of [FOIA,

which] is in favor of disclosure."  *Federal Bureau of Investigation v. Abramson*,

456 U.S. 615, 631, 630 (1982).  That policy is furthered, and the rule of

narrow construction is obeyed, when courts decline to recognize

Exemption 5 as protecting documents that would not be "*normally*

privileged in the civil discovery context."  *National Labor Relations Bd. v.*

*Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (emphasis added); *see, e.g.,*

*Burka v. Department of Health and Human Servs.*, 87 F.3d 508, 521 (D.C. Cir.

1996) ("[W]e cannot say that there is an established or well-settled practice of protecting research data in the realm of civil discovery on the grounds that disclosure would harm a researcher's publication prospects.") (rejecting government's Exemption 5 argument).

But narrowly construing the scope of the statutory exemptions does not justify altering the protections of the work-product doctrine, which finds its source outside FOIA.  *See Hickman*, 329 U.S. at 510-11.  Exemption 5 protects privileged documents from disclosure.  It does not provide a basis for distinguishing among them.

In enacting FOIA, Congress "recognized the important interests served by the exemptions."  *Abramson*, 456 U.S. at 630-31.  "It is . . . clear that Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5."  *Sears*, 421 U.S. at 154.  And there is nothing in the text of FOIA or in its legislative history to suggest that Congress intended for only a truncated version of the work-product doctrine to apply.  *See, e.g.,* S. Rep. No. 89-813, at 2 (1965) (stating that Exemption 5 "would include the working papers of the agency attorney").

41

"Thus, if a particular Government document falls within the scope of the work-product privilege, then it is likewise exempt from disclosure, in the FOIA context, by virtue of Exemption 5." *Jordan v. Department of Justice*, 591 F.2d 753, 775 (D.C. Cir. 1978). Indeed, because "the Supreme Court has made clear" that the attorney work-product doctrine "should be interpreted broadly and held largely inviolate," *Judicial Watch*, 432 F.3d at 369, this Court has rejected attempts to limit the application of that doctrine in FOIA cases, *see, e.g., id*. at 370; *Schiller*, 964 F.2d at 1208.

The Department of Justice employs thousands of federal prosecutors who represent the United States in criminal cases brought against tens of thousands of federal defendants each year. *See* U.S. Dep't of Justice, *FY 2015 Budget Request At A Glance (U.S. Attorneys)* (n.d.), http://www.justice.gov/sites/default/files/jmd/legacy/2014/05/04/usa.pdf (number of attorneys in U.S. Attorney's offices) (last visited Aug. 27, 2015); U.S. Dep't of Justice, *United States Attorneys' Annual Statistical Report: Fiscal Year 2014*, at 4 (n.d.), http://www.justice.gov/sites/default/files/usao/pages/attachments/2015/03/23/14statrpt.pdf (defendants in pending criminal

cases) (last visited Aug. 27, 2015).  To ensure uniformity and consistency in

the litigation of those cases, the Department provides litigation advice in

documents like the Blue Book and in occasional guidance memoranda.  Of

necessity, that litigation advice is not case specific.

Giving the government the full benefit of the attorney work-product

privilege under Exemption 5 makes sense because the purpose of the

privilege is "to protect the adversary trial process itself."  *Coastal States*, 617

F.2d at 864; *see id*. (explaining that the purpose of the privilege "is to

encourage effective legal representation within the framework of the

adversary system" (quotation marks omitted)).  By providing federal

prosecutors with uniform litigation advice, the Department of Justice

enables the government's lawyers to conduct litigation according to the

best practices developed by the Department as a whole, which benefits not

only the interests of their client, the United States, but also "the integrity of

our system."  *Id*.  By contrast, preventing the government, as NACDL

proposes, from relying on the privilege when its lawyers prepare litigation

advice unconnected to specific claims or particular transactions, but to be

used in suits brought by the government, "would ignore the function performed by the withheld material and would conflict with the well established rules of discovery." *Delaney*, 826 F.2d at 127 (citation and parenthetical explanation omitted).

2.  Next, NACDL argues that the Blue Book is not attorney work product because it contains "comprehensive guidelines about criminal discovery and neutral, objective analysis of [federal prosecutors'] obligations" and because it "does not plot litigation strategy."  Br. 25 (quotation marks and citation omitted); *see id*. at 17-18.  Relatedly, NACDL contends that the Blue Book is not attorney work product because it only articulates agency policy concerning federal prosecutors' discovery obligations.  Br. 19-21, 28-30.  Those arguments are mistaken.

The quotations in this brief from the declarations filed in the district court make clear that NACDL badly mischaracterizes the Blue Book.  And the text of the Blue Book itself, which the district court reviewed *in camera*, confirms the error of NACDL's description.  For example, the Blue Book "describes the types of claims defense counsel have raised and could raise

44

regarding different discovery issues, or the tactics they could employ in

litigation against the Government, and the arguments prosecutors can

make to respond to these claims and the steps they should take to counter

defense counsel tactics and protect Government investigations and

prosecutions."  JA 85 (Gerson Decl. ¶ 21); *see id*. at 86 (explaining that while

the Blue Book "endeavors to accurately describe the prosecutor's discovery

obligations,"  it does so in the context of a litigation manual that provides

strategic litigation guidance to prosecutors concerning discovery matters).

That is precisely the sort of litigation-related content that NACDL

elsewhere acknowledges is attorney work product.  *See* Br. 17, 19-20

(discussing *Schiller* and *Delaney*); *see id*. at 27 (acknowledging that advice

intended to "help ensure victory in litigation  .  .  .  points to work-product

protection" (emphasis omitted)).

    3.  NACDL further argues that the Blue Book cannot be attorney

work product because it is agency "working law" and FOIA embodies "a

strong congressional aversion to 'secret agency law.'"  Br. 31 (quoting *Sears*,

421 U.S. at 153); *see generally id*. at 21-22, 30-32.  NACDL is simply mistaken

in describing the Blue Book as containing "working law."  An agency's

"working law," the Supreme Court has explained, consists of the reasons

that "supply the basis for an agency policy actually adopted."  *Sears*, 421

U.S. at 152.  But as the district court correctly determined, JA 121, the Blue

Book is not the Department of Justice's "working law."  The Department's

policies concerning federal attorneys' disclosure obligations in criminal

prosecutions are publicly stated in the USAM and three memoranda from

the Deputy Attorney General.  *See supra* pp. 12-15; *see also* JA 101-03

(Second Goldsmith Decl. ¶¶ 5-6) (discussing USAM provisions and Deputy

Attorney General memoranda).  "The Blue Book," by contrast, "does not

establish new rules or policies that prosecutors have an obligation to follow

in all investigations and prosecutions."  JA 103 (Second Goldsmith Decl.

¶ 7).  Instead, it "advises prosecutors on the types of challenges they may

encounter in the course of prosecutions and potential responses and

approaches to those challenges that they are encouraged to consider."  *Id*.

(Second Goldsmith Decl. ¶ 8).

As the district court correctly determined, disclosure of the Blue Book would not be appropriate in any event, even if that document did contain some new rules or policies.  JA 121-22.  The Department of Justice would have an affirmative obligation to make public any policy it adopts governing the disclosure obligations of federal prosecutors.  *See* 5 U.S.C. § 552(a)(2).  But a statement of policy contained in a document that is attorney work product does not make *that* document subject to disclosure under FOIA.  *See Federal Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 n.23 (1979) (noting that the Supreme Court previously "held that a memorandum subject to the affirmative disclosure requirement of § 552(a)(2) was nevertheless shielded from disclosure under Exemption 5 because it contained a privileged attorney's work product" (discussing *Sears*, 421 U.S. at 160)); *see also Tax Analysts v. Internal Revenue Serv.*, 294 F.3d 71, 76 (D.C. Cir. 2002) ("[T]he District Court correctly determined that [the Internal Revenue Service] need not segregate and release agency working law from [documents] withheld in their entirety pursuant to the attorney work product privilege.").

4.  Finally, NACDL argues that even if it contains attorney work product, the Department of Justice nevertheless must "make the Blue Book available in redacted form," disclosing any material "conveying agency policies and background rules for criminal discovery, distinct from any strategic or tactical advice."  Br. 32.  That is because, NACDL contends, "the ordinary rule under FOIA, regardless of which exemption is claimed, is that segregation and redaction are mandatory."  *Id.*; *see* 5 U.S.C. § 552(b). NACDL acknowledges that "documents that are *purely* work product may be withheld in full," and that factual material in such a document need not be segregated.  Br. 35 (discussing *Judicial Watch*, 432 F.3d at 371, and *Martin v. Office of Special Counsel, Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1187 (D.C. Cir. 1987)).  But it contends that this Court's decision in *United States v. Deloitte LLP*, 610 F.3d 129 (D.C. Cir. 2010), requires the Department of Justice to disclose portions of the document that do not directly relate to litigation strategy.  Br. 33-36.  That argument is incorrect.

In *Deloitte*, the document at issue was a "draft memorandum prepared by Deloitte that summarizes a meeting between [Dow Chemical

48

Company] employees, Dow's outside counsel, and Deloitte employees

about the possibility of litigation over" a partnership "and the necessity of

accounting for such a possibility in an ongoing audit." 610 F.3d at 133.

While the privilege log and a declaration supported the contention that the

document "does contain thoughts and analyses by legal counsel," *id*. at 139,

the memorandum concerned a meeting that "included both Deloitte and

Dow employees, as well as Dow's outside counsel" and "[t]he document

itself was prepared by a third party." *Id*. In light of the partially non-

litigation subject matter of the memorandum and the attendees at the

meeting, the Court observed that it was possible that the document "also

includes other facts, other thoughts, other analyses by non-attorneys which

may not be so intertwined with the legal analysis as to warrant protection

under the work-product doctrine." *Id*. For that reason, the Court

remanded to the district court for an *in camera* determination whether the

document "is entirely work product." *Id*.

 *Deloitte* is readily distinguishable. The Blue Book was created

entirely by Department of Justice attorneys for the use of federal

prosecutors in conducting litigation concerning discovery-related matters.

*See, e.g.,* JA 85-86 (Gerson Decl. ¶ 21).  There is no possibility that the Blue

Book contains "other facts, other thoughts," or "other analyses *by non-*

*attorney*s" that may be independent of the legal analysis contained in the

document.  *Deloitte*, 610 F.3d at 139 (emphasis added); *see Nobles*, 422 U.S. at

238 ("At its core, the work-product doctrine shelters the mental processes

of the attorney.").  NACDL has identified no decision, and we are aware of

none, in which this Court has required an agency to disclose purportedly

unprivileged information contained in a document prepared entirely by

agency attorneys for other agency attorneys in anticipation of litigation.

## II.    THE BLUE BOOK IS EXEMPT FROM DISCLOSURE UNDER EXEMPTION 7(E).

### A.    The Blue Book Was Compiled for Law Enforcement Purposes and Its Production Would Disclose Techniques, Procedures, or Guidelines That Reasonably Could Be Expected to Risk Circumvention of the Law.

Alternatively, the Department of Justice properly withheld the Blue

Book under Exemption 7(E).  That exemption protects from disclosure

"records or information compiled for law enforcement purposes" to the

extent that production of the document "would disclose techniques and

procedures for law enforcement investigations or prosecutions, or would

disclose guidelines for law enforcement investigations or prosecutions if

such disclosure could reasonably be expected to risk circumvention of the

law."  5 U.S.C. § 552(b)(7)(E).

There can be little question that the Blue Book satisfies the threshold

requirement for Exemption 7 that the document was "compiled for law

enforcement purposes."  *Public Emps. for Envtl. Responsibility v. United States*

*Section, Int'l Boundary & Water Comm'n, U.S.–Mexico*, 740 F.3d 195, 204-05

(D.C. Cir. 2014) (*PEER*).  The Blue Book was created to advise federal

prosecutors concerning "discovery-related challenges [arising] in the

course of prosecuting federal criminal cases."  JA 94 (First Goldsmith Decl.

¶ 7).  Prosecutors also use the Blue Book "during their work with other law

enforcement officials" to ensure that "[i]n both the investigative and

prosecution stages of federal crimes," "discovery-related issues do not

compromise [Department of Justice] investigations and prosecutions."  JA

94-95 (First Goldsmith Decl. ¶ 7).  Because the Blue Book is a document

"relating to guidelines, techniques, and procedures for law enforcement

investigations and prosecutions," it "clearly satisf[ies] the 'law enforcement

purposes' threshold of Exemption 7."  *Tax Analysts*, 294 F.3d at 78; *see also*

*PEER*, 740 F.3d at 203 (explaining that the Court is "more deferential" to

"claimed purpose for the particular records" if the "agency's principal

function is law enforcement").

   Once the threshold is met, a document comes within Exemption 7(E)

if production of the document "could reasonably be expected to risk

circumvention of the law" by disclosing "guidelines for law enforcement

investigations or prosecutions" or, perhaps, "techniques and procedures

for law enforcement investigations or prosecutions."[8]  5 U.S.C.

§ 552(b)(7)(E).  "[T]he exemption looks not just for circumvention of the

_____

   [8] As noted, *see supra* n.3, this Court has not decided whether the risk-of-circumvention requirement applies only to "guidelines" or also to "techniques and procedures."  *But see Hamdan v. Department of Justice*, ___ F.3d___, No. 13-55172, 2015 WL 4773499, at *13 (9th Cir. Aug. 14, 2015) (requirement applies only to guidelines); *Allard K. Lowenstein Int'l Human Rights Project v. Department of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010) (same).  The Blue Book contains "techniques and procedures" as well as "guidelines."  *See* JA 53 (*Vaughn* Index).  Because disclosure of the Blue Book would risk circumvention of the law, however, there is no need in this case for the Court to decide the scope of the risk-of-circumvention requirement.

law, but for a risk of circumvention; not just for an actual or certain risk of

circumvention, but for an expected risk; not just for an undeniably or

universally expected risk, but for a reasonably expected risk; and not just

for certitude of a reasonably expected risk, but for the chance of a

reasonably expected risk." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193

(D.C. Cir. 2009).  The Blue Book "clear[s] that relatively low bar" because

its production "might increase the risk that a law will be violated or that

past violators will escape legal consequences."  *PEER*, 740 F.3d at 204-05

(quotation marks omitted).

The Blue Book "is a comprehensive litigation guide intended to offer

strategy and advice to prosecutors in defending against discovery-related

challenges by criminal defendants."  JA 98 (First Goldsmith Decl. ¶ 12).  It

contains advice to litigators about how to balance the government's

disclosure obligations against its law enforcement interests, such as

protecting witnesses and ongoing investigations.  JA 94-95 (First Goldsmith

Decl. ¶¶ 7, 8).  And it provides guidance on how best to ensure that the

government receives appropriate discovery from the defense.  JA 96 (First

Goldsmith Decl. ¶ 9).  Throughout the document are candid discussions about "the limitations of certain arguments that prosecutors could make" in response to "defense counsel tactics."  JA 85 (Gerson Decl. ¶ 21).

In at least two ways, disclosing candid assessments about the government's discovery-related litigation arguments could increase the risk that a law will be violated or that past violators will escape legal consequences.  First, a criminal defendant who is aware of the government's own assessment of the vulnerabilities of its arguments concerning discovery from the defendant could potentially alter his or her behavior in a manner calculated to hide incriminating evidence, thereby making it more likely that he or she will successfully circumvent the law and escape punishment.  *See, e.g.*, JA 97-98 (First Goldsmith Decl. ¶ 11); *see Mayer Brown*, 562 F.3d at 1193-94 (holding exempt from disclosure under Exemption 7(E) document analyzing "litigation hazards" faced by the Internal Revenue Service in prosecuting illegal tax shelters because production of the document could inform potential tax evaders "how to

best structure an evasion so as to avoid the maximum enforcement efforts

of the [Internal Revenue Service]").

Second, providing criminal defendants with information about the

procedures and techniques the government uses to balance its disclosure

obligations against its law enforcement interests could increase the risk that

a criminal defendant could illegally interfere with those interests.  For

example, "premature disclosure of Government witness information  .  .  .

could 'disrupt ongoing investigations' and expose prospective witnesses to

serious harm."  *United States v. Ruiz*, 536 U.S. 622, 631-32 (2002) (quoting

Brief for the United States).  A criminal defendant with knowledge of the

procedures and techniques the government uses to protect the identity of

witnesses and other sensitive sources could use that information to obtain

the untimely disclosure of the identity of such individuals, leading to "a

greater likelihood of witness intimidation and retaliation."  JA 98 (First

Goldsmith Decl. ¶ 11).

Because production of the Blue Book "might increase the risk that a

law will be violated or that past violators will escape legal consequences,"

*PEER*, 740 F.3d at 204-05 (quotation marks omitted), it is exempt from disclosure under Exemption 7(E).

### B.    NACDL's Contrary Arguments Lack Merit.

NACDL's contrary arguments again are based on inaccurate statements of the governing law or mischaracterizations of the Blue Book.

1.  NACDL first contends that the Blue Book does not satisfy the threshold requirement for Exemption 7(E) because that document was not compiled for law enforcement purposes.  Br. 38-41.  NACDL appears to argue that materials are compiled for law enforcement purposes only if they "focus directly on specific alleged illegal acts which could result in civil or criminal sanctions."  Br. 39 (quoting *Jefferson v. Department of Justice, Office of Prof'l Responsibility*, 284 F.3d 172, 177 (D.C. Cir. 2002).  But the response to that contention is straightforward:  the statutory threshold is "not limited to records or information addressing only individual violations of the law."  *Tax Analysts*, 294 F.3d at 79.  "[I]nternal agency material relating to guidelines, techniques, and procedures for law

enforcement investigations and prosecutions" also "clearly satisfy" Exemption 7's threshold requirement.  *Id*. at 78.

NACDL elsewhere concedes that the Blue Book contains "guidelines" concerning discovery in criminal prosecutions.  Br. 45-46.  That would appear to settle the question.  But NACDL further argues that the Blue Book does not contain the right *sort* of guidelines related to criminal prosecutions to qualify as a document compiled for law enforcement purposes.  Br. 40-41.  The Blue Book, NACDL contends, "was created to regulate prosecutors' litigation conduct" and so was created by the Department of Justice as part of its management function, and not as part of its prosecutorial function.  Br. 40.

Even assuming that the distinction NACDL draws is material, its characterization of the Blue Book ignores the fact that the document "does not establish new rules or policies that prosecutors have an obligation to follow in all investigations and prosecutions."  JA 103 (Second Goldsmith Decl. ¶ 7).  Instead, the Blue Book is "a litigation guide intended to offer strategy and advice to prosecutors."  JA 99 (First Goldsmith Decl. ¶ 14).  In

so doing, the Blue Book seeks to "safeguard[] legitimate law enforcement concerns and advanc[e] the Government's interests in litigation."  JA 103 (Second Goldsmith Decl. ¶ 7).  The guidance contained in the Blue Book therefore directly relates to the Department's prosecutorial interests.

2.  NACDL next contends that disclosure of the Blue Book could not "conceivably" risk circumvention of the law.  Br. 9; *see* Br. 41.  NACDL argues that because the "Blue Book has nothing to do with crime *detection*," its disclosure could not "educate criminals about government investigations and teach them to avoid being caught."  Br. 42.  But Exemption 7(E) is not limited to investigation or detection methods.  It applies to techniques, procedures, and guidelines "for law enforcement investigations *or prosecutions*."  5 U.S.C. § 552(b)(7)(E) (emphasis added).[9]

_____

[9] Before 1986, Exemption 7(E) applied only to "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would  .  .  .  disclose investigative techniques and procedures."  5 U.S.C. § 552(b)(7)(E) (1982).  Congress broadened Exemption 7(E) to apply to documents relating to prosecutions as well as investigations.  *See* Pub. L. No. 99-570, § 1802(a), 100 Stat. 3207, 3207-48 to 3207-49 (1986); *see also* U.S. Dep't of Justice, Attorney General's Memorandum on the 1986 Amendments to the Freedom of Information

The Blue Book discusses legal arguments available to the government concerning criminal defendants' discovery obligations, and it addresses the potential weaknesses of those arguments.  *See* JA 96 (First Goldsmith Decl. ¶ 9); JA 85-86 (Gerson Decl. ¶ 21).  Providing a criminal defendant with the government's potential discovery arguments and its assessment of the strengths and weaknesses of those arguments could increase the risk that the defendant will place incriminating evidence beyond the reach of the government's legal arguments, thus helping the defendant to evade punishment.

NACDL acknowledges that disclosing information that "could allow defendants to destroy evidence or intimidate witnesses  .  .  .  would surely circumvent the law."  Br. 44.  But, it contends, the Department of Justice has not "explain[ed] with any clarity or specificity why releasing the Blue

---

Act, at 15 (1987), http://www.justice.gov/archive/oip/86agmemo.htm (explaining that the 1986 amendments "should considerably expand the breadth of Exemption 7(E) protection") (last visited Aug. 27, 2015). NACDL's interpretation ignores the 1986 amendment.

Book could conceivably increase the risk of such acts." *Id.* NACDL seeks

to impose a much higher obligation than is required by Exemption 7(E).

"Rather than requiring a highly specific burden of showing how the

law will be circumvented, exemption 7(E) only requires that the [agency]

demonstrate logically how the release of the requested information might

create a risk of circumvention of the law." *Mayer Brown*, 562 F.3d at 1194

(brackets omitted). Knowing the government's own assessment of the

strengths and weaknesses of its arguments for obtaining discovery from a

defendant has an obvious and logical connection to an increased risk that a

potential criminal defendant will be able to prevent the discovery of

incriminating evidence. *Cf. Morley v. CIA*, 508 F.3d 1108, 1129 (D.C. Cir.

2007) ("It is self-evident that information revealing security clearance

procedures could render those procedures vulnerable and weaken their

effectiveness at uncovering background information on potential

candidates."). It is similarly obvious that a criminal defendant with

knowledge of the procedures and techniques the government uses to

protect the identity of witnesses and other sensitive sources could use that

information to obtain the untimely disclosure of the identity of such

individuals, leading to "a greater likelihood of witness intimidation and

retaliation."  JA 98 (First Goldsmith Decl. ¶ 11).[10]

3.  Finally, NACDL argues that if the Court concludes that the

Department of Justice has established that the Blue Book is exempt from

disclosure under Exemption 7(E), the Court nevertheless should order the

Department to segregate the exempt portions of the document and release

"its policies on and interpretation of its disclosure obligations."  Br. 49.  The

Department of Justice has already made public the policies governing

federal prosecutors' disclosure obligations.  *See supra* pp. 12-15 (discussing

USAM and three memoranda from the Deputy Attorney General).  And the

Blue Book does not itself "establish new rules or policies that prosecutors

have an obligation to follow in all investigations and prosecutions."  JA 103

---

[10] NACDL argues that because the USAM and other public sources discuss the government's interest in protecting witnesses, disclosure of information in the Blue Book addressing that topic could not risk circumvention of the law.  Br. 47-48.  But unlike the public sources NACDL identifies, the Blue Book provides candid discussions of legal arguments available to the government, which are not publicly available in other documents.  *See, e.g.*, JA 101-03 (Second Goldsmith Decl. ¶¶ 5-7).

(Second Goldsmith Decl. ¶ 7).  While the Blue Book does discuss the

policies announced in the USAM and Deputy Attorney General

memoranda, those discussions are contained within the litigation analysis

and guidance and cannot reasonably be segregated.  *See* JA 91 (Gerson

Decl. ¶ 35) ("[B]ecause the Blue Book as a whole consists of law

enforcement guidelines, and many of the law enforcement techniques,

procedures, and guidelines described are interspersed within the legal

analysis throughout the book, no part of the book can be segregated for

disclosure under Exemption 7(E).").

## CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

BENJAMIN C. MIZER
   *Principal Deputy Assistant*
    *Attorney General*

VINCENT H. COHEN, JR.
   *Acting United States*
    *Attorney*

LEONARD SCHAITMAN

s/ Lewis S. Yelin
LEWIS S. YELIN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7239*
   *U.S. Department of Justice*
   *950 Pennsylvania Ave., N.W.*
   *Washington, D.C.  20530*
   *(202) 514-3425*

August 28, 2015

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Palatino Linotype, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,108 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

s/ Lewis S. Yelin
LEWIS S. YELIN
*Counsel for Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2015, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the District of Columbia Circuit by using the appellate

CM/ECF system, which, under the Court's rules, constitutes service on all

parties registered with the CM/ECF system.

I further certify that I caused eight paper copies of this brief to be

filed with the Court.


s/ Lewis S. Yelin
LEWIS S. YELIN
    *Counsel for Appellees*

**ADDENDUM**

# ADDENDUM CONTENTS

5 U.S.C. § 552(a)(1), (2)................................................................... Add. 1

5 U.S.C. § 552(b)............................................................................. Add. 3

in consultation with the Secretary of the Treasury, shall complete a study on the use of administrative subpoena power by executive branch agencies or entities and shall report the findings to the Committees on the Judiciary of the Senate and the House of Representatives. Such report shall include—

"(1) a description of the sources of administrative subpoena power and the scope of such subpoena power within executive branch agencies;

"(2) a description of applicable subpoena enforcement mechanisms;

"(3) a description of any notification provisions and any other provisions relating to safeguarding privacy interests;

"(4) a description of the standards governing the issuance of administrative subpoenas; and

"(5) recommendations from the Attorney General regarding necessary steps to ensure that administrative subpoena power is used and enforced consistently and fairly by executive branch agencies.

"(b) REPORT ON FREQUENCY OF USE OF ADMINISTRATIVE SUBPOENAS.—

"(1) IN GENERAL.—The Attorney General and the Secretary of the Treasury shall report in January of each year to the Committees on the Judiciary of the Senate and the House of Representatives on the number of administrative subpoenas issued by them under this section and the identity of the agency or component of the Department of Justice or the Department of the Treasury issuing the subpoena and imposing the charges.

"(2) EXPIRATION.—The reporting requirement of this subsection shall terminate in 3 years after the date of the enactment of this section [Dec. 19, 2000]."

## § 552. Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the

Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

(D) copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and

(E) a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—

(i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

(3)(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

(D) For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

(E) An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4))) shall not make any record available under this paragraph to—

(i) any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

(ii) a representative of a government entity described in clause (i).

(4)(A)(i) In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

(ii) Such agency regulations shall provide that—

(I) fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

(II) fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

(III) for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication.

In this clause, the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

(iii) Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

(iv) Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section—

(I) if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

(II) for any request described in clause (ii) (II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

(v) No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

(vi) Nothing in this subparagraph shall supersede fees chargeable under a statute specifically

of expedited processing of a request for records after the agency has provided a complete response to the request.

(v) For purposes of this subparagraph, the term "compelling need" means—

(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

(vi) A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

(7) Each agency shall—

(A) establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

(B) establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including—

(i) the date on which the agency originally received the request; and

(ii) an estimated date on which the agency will complete action on the request.

(b) This section does not apply to matters that are—

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

(2) related solely to the internal personnel rules and practices of an agency;

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters which would not be available

by law to a party other than an agency in litigation with the agency;

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

(c)(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and—

(A) the investigation or proceeding involves a possible violation of criminal law; and

(B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

(2) Whenever informant records maintained by a criminal law enforcement agency under an in-